******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* VICTOR ANDINO
(AC 38475)

DiPentima, C. J., and Keller and Prescott, Js.

*Argued February 14—officially released June 20, 2017*

(Appeal from Superior Court, judicial district of New
Britain, Alander, J.)

*Daniel J. Krisch*, assigned counsel, for the appellant (defendant).

*Jonathan M. Sousa*, special deputy assistant state's
attorney, with whom, on the brief, were *Gail P. Hardy*,
state's attorney, and *Brett J. Salafia*, senior assistant
state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Victor Andino, appeals from the judgment of conviction, rendered following a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). Additionally, following a plea of nolo contendere, the trial court found the defendant guilty of being a persistent serious felony offender under General Statutes § 53a-40 (c).[1] The defendant claims (1) that the court improperly denied his motion to suppress an inculpatory oral statement that he provided to the police and (2) that the evidence did not support his conviction of criminal possession of a firearm. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On September 29, 2010, the defendant and the victim,[2] Jorge David Aponte, were arguing with one another in the parking lot of an apartment complex on South Whiting Street in New Britain. The argument between the two men, portions of which were overheard and witnessed by residents who lived nearby,[3] was related to the victim's illegal drug selling activities in the neighborhood. At one point during the argument, the victim was holding a large stick and the defendant was holding what appeared to be a machete or a knife. The defendant threatened to shoot the victim, and, ultimately, he shot the victim in his left shoulder before fleeing the scene. Gunshots were overheard by multiple witnesses around the time of the defendant's argument with the victim and in the vicinity of where the defendant and the victim were arguing. The victim drove away from the scene and received medical treatment for his injury, which was not life threatening, at Hartford Hospital.

A bystander notified the police that a shooting had occurred and, following an investigation of the shooting, New Britain police obtained an arrest warrant for the defendant. On October 18, 2011, the police located the defendant and executed the arrest warrant. The defendant waived his *Miranda* rights[4] and, during an interview conducted by Jonathan Webster, then a detective with the New Britain Police Department, the defendant stated that, during an argument with the victim related to money and the sale of drugs in the neighborhood, he shot the victim. The defendant stated that he was unhappy that the victim was selling drugs in an area that he and others controlled. He stated that he shot the victim after the victim charged at him with a large stick. Because the defendant did not want others to know that he had provided a statement to the police, however, he declined to provide the police with a written statement. Additional facts will be set forth as necessary.

## I

First, the defendant claims that the court improperly denied his motion to suppress the oral statement that he provided to the police. We disagree.

The following additional facts are relevant to the present claim. By written motion filed on August 6, 2014, the defendant moved to suppress "any and all statements made by [him] . . . including, but not limited to, statements made regarding his alleged involvement in a shooting in September, 2010." In relevant part, the defendant alleged in the motion to suppress that he had been subjected to custodial interrogation by Webster and that "Webster never notified [him] . . . of his constitutional rights as required by *Miranda* v. *Arizona*, [384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)]." On September 2, 2014, the court held a hearing on the motion during which it received documentary evidence and heard testimony from both Webster and the defendant.

In relevant part, Webster testified that, on October 18, 2011, he and another detective observed the defendant enter a building in New Britain. After the defendant exited the building, the defendant laid down in the backseat of a truck. The police stopped the truck as it was being driven away. The police placed the defendant under arrest and transported him to the police department. The defendant was taken to an interview room in the detective bureau, where he met with Webster. During the interview, the defendant was restrained in leg shackles. Webster testified that he began his conversation with the defendant by advising him of his *Miranda* rights. He testified that, initially, his advisement was verbal in nature, but that he subsequently had the defendant complete a *Miranda* rights advisement form. Webster testified that he communicated with the defendant in English, and that he wrote the defendant's name, address, date of birth, educational information, and information about the defendant's reading and writing skills on the form. Webster read each right listed on the *Miranda* rights advisement form to the defendant, and the defendant wrote his initials next to each listed right.

Webster testified that, thereafter, he asked the defendant if he was willing to speak to him. Webster testified that the defendant stated that he was willing to talk to him, and that, in Webster's presence, the defendant signed the bottom portion of the *Miranda* rights advisement form, thereby indicating that he had been advised of, understood, and freely waived his *Miranda* rights.[5] Webster testified that he did not write the defendant's initials on the form or sign the defendant's name on the form. Webster testified, however, that he signed his own name on the form.[6] The court admitted the signed *Miranda* rights advisement form into evidence.

During the interview, in Webster's presence, the defendant also signed a uniform arrest report that, among other things, reflected personal information about the defendant as well as the charges being brought against him. Webster signed the uniform arrest report, as well. The court admitted the signed report into evidence.

Webster testified further that, after the defendant waived his *Miranda* rights, the defendant told him that on the day of the shooting he had gotten into an argument with the victim about drug sales and money. According to Webster, the defendant related to him that the argument escalated, the victim was armed with a machete and an item that the defendant described as a long board and, ultimately, the defendant shot the victim. During the interview, the defendant was provided with food and water, and he was permitted to use the bathroom. At the conclusion of the interview, the defendant stated that the information that he provided was true and accurate.

At the suppression hearing, the defendant testified that his *Miranda* rights were not explained to him and that he did not initial or sign the *Miranda* rights advisement form or the uniform arrest report. The defendant testified that he did not sign any paperwork at the police department on October 19, 2011. The court admitted into evidence two examples of the defendant's signature. One example came in the form of an identification card that he claimed to have signed five years prior to his testimony. The other example came in the form of a blank sheet of paper that he signed during his testimony at the suppression hearing. The defendant testified that, in relation to the events at issue, he was not questioned until he arrived at the police headquarters and that nobody had advised him of his *Miranda* rights. Moreover, the defendant testified that he did not make the statements that Webster attributed to him, and that he had not stated that he shot anyone. Instead, the defendant testified that, while he was in police custody, he merely asked Webster why he had been arrested.

During argument on the motion to suppress, defense counsel argued that the evidence demonstrated that the police had not advised the defendant of his *Miranda* rights, either orally or in writing, prior to his interrogation. Defense counsel argued that the defendant's signatures on the *Miranda* rights advisement form and the uniform arrest report, both of which, Webster testified, had been signed by the defendant in his presence, did not appear to match the defendant's signature on his identification card, the signature that he provided during his testimony, or the defendant's signatures that appeared on two other uniform arrest reports that were introduced into evidence by the state. Defense counsel argued that the defendant had not been advised of his rights as Webster testified, the defendant had not been

afforded an opportunity to sign the documents at issue, and the documents at issue had been "signed by somebody else." Defense counsel argued that the signatures appeared to have been written by the same person, namely, Webster, and that this had been done because the police had an interest in filling up "this hole" in their case against the defendant.

The prosecutor argued that Webster credibly testified at the suppression hearing that he had advised the defendant of his *Miranda* rights, that the *Miranda* rights advisement form memorialized that the defendant was so advised, and that the form reflected that the defendant waived his *Miranda* rights. The court asked the prosecutor to comment on defense counsel's argument that the signatures on the forms at issue in the present case were dissimilar to the other examples of the defendant's signature that were in evidence. The prosecutor acknowledged that the signatures appeared to be "somewhat different," but argued that, in light of Webster's testimony, any dissimilarity did not support a conclusion that the defendant did not sign the forms at issue. Also, the prosecutor argued that, if the police had fabricated the defendant's confession, it is unlikely that they would have concocted the "halfway self-defense claim" reflected in the confession.

Following argument by counsel, the court orally rendered its decision. In relevant part, the court stated: "[B]ased upon the evidence presented, I find the following facts: that on October 18, 2011, at approximately 4:30 p.m. . . . the defendant was at the New Britain police station in the presence of . . . Webster . . . [and] I credit Detective Webster's testimony that prior to questioning [the defendant] with respect to an incident that occurred on September 29, 2010, at South Whiting Street, that he verbally advised [the defendant] of his *Miranda* rights, all of his rights; that [the defendant] spoke English; that he understood English, the verbal, oral English; and that he voluntarily waived those *Miranda* rights and then spoke to Detective Webster about the incident on September 29, 2010.

"I do agree with [defense counsel's argument that] those signatures are not the same. They don't appear to be the same. However, I don't find that difference to be determinative here as to the truthfulness of Detective Webster's testimony. I find that he did verbally advise [the defendant] of his *Miranda* rights, which [the defendant] voluntarily waived and subsequently gave his statement. So, for those reasons, the motion to suppress is denied."

During the pendency of the present appeal, the defendant asked the court to articulate with respect to several of its findings. Relevant to the present claim, the defendant asked the court to articulate whether he had initialed or signed the *Miranda* rights advisement form and whether Webster had testified falsely that the defen-

dant had initialed and signed the form. The court granted articulation with respect to these inquiries and, in an articulation dated June 30, 2016, the court stated in relevant part: "The only factual finding that I made with respect to the signatures on the defendant's [identification] card and the exemplar and the signature on the defendant's waiver of rights form is that the signatures did not appear to be the same. I did not find that the signatures were made by two different individuals. I also did not find that Detective . . . Webster testified falsely that the defendant initialed and signed the waiver of rights form. I found that Detective Webster verbally advised the defendant of his *Miranda* rights and that the defendant voluntarily and knowingly waived those rights prior to speaking with Detective Webster."

At trial, following the court's denial of the defendant's motion to suppress, the state presented evidence of the defendant's inculpatory statements to the police. In relevant part, Webster testified that after he advised the defendant of his *Miranda* rights both orally and in writing, the defendant waived his *Miranda* rights and answered questions about his involvement in the victim's shooting. Webster testified that the defendant told him that the defendant and some of his associates were engaged in an ongoing dispute with the victim concerning money and the fact that the victim was selling drugs illegally in what they believed was "their drug territory and taking their sales from them." Webster testified, as well, that the defendant stated to him that he was involved in a physical altercation with the victim on September 29, 2010, the victim was armed with a machete and a large stick during the altercation, and that, using a firearm that one of his associates, Richard Ruiz, had given to him, "he shot [the victim] because [the victim] was coming at him." Webster testified that the defendant told him that he fled the area after the victim fled.

The defendant challenges the court's finding that he was advised of and waived his *Miranda* rights. The defendant's challenge to the court's ruling, thus, focuses on the court's resolution of a question of fact that was essential to a legal determination that implicated the defendant's constitutional rights. "To be valid, a [*Miranda*] waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 50, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). There is no requirement in our law that a valid *Miranda* waiver must be evidenced by a written waiver. "[T]he state must demonstrate: (1) that the

defendant understood his rights, and (2) that the defendant's course of conduct indicated that he did, in fact, waive those rights. . . . In considering the validity of [a] waiver, we look, as did the trial court, to the totality of the circumstances of the claimed waiver." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Santiago*, 245 Conn. 301, 320, 715 A.2d 1 (1998).

The defendant acknowledges the established proposition that this court is obligated to defer to the trial court with respect to matters related to the credibility of witnesses. The defendant argues that the court's factual findings with respect to the waiver issue are clearly erroneous on the ground that the court, in ruling on the motion to suppress, essentially made contradictory factual findings in that it found Webster to be a credible witness and that the signature on the *Miranda* rights advisement form did not appear to be the same as the other signatures of the defendant that were admitted into evidence. Any difference in the appearance of the signatures, the defendant posits, undermines Webster's testimony that the defendant signed the form. Thus, the defendant argues that although the court found that Webster had testified in a credible manner, in light of the disparity in the appearance of the signatures at issue, it nonetheless should not have relied on any of Webster's testimony when making its factual findings. The defendant argues: "The court found that the defendant had waived his *Miranda* rights based solely on Webster's testimony. . . . However, the court also found that the signature on the waiver of rights form was 'not the same' as four known samples of the defendant's signature (including an in-court exemplar). . . . This disparity casts grave doubt on Webster's testimony; and the conflict between the court's acknowledgement of that disparity and its belief of Webster makes its ultimate finding of a valid waiver clearly erroneous. Moreover, the error was not harmless beyond a reasonable doubt because the defendant's statements [to Webster] were the linchpin of the state's case: no one saw the defendant shoot [the victim]; the police never recovered a gun; and no physical evidence tied the defendant to the crime." (Citations omitted.) The defendant argues that "[a] scrupulous examination of the record should leave this court with the 'definite and firm conviction' that the defendant did not voluntarily, knowingly, and intelligently waive his *Miranda* rights." In challenging the court's ultimate reliance on Webster's version of events, the defendant argues: "It is clearly erroneous for a trial court to make a finding that its other findings contradict . . . or that is inescapably incongruent with its decision to credit a witness' testimony. . . . While the trial court may choose between conflicting testimony of different witnesses . . . the substantial evidence requirement remains." (Citations omitted; internal quotation marks omitted.)

"[T]he standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . .

"Notwithstanding our responsibility to examine the record scrupulously, it is well established that we may not substitute our judgment for that of the trial court when it comes to evaluating the credibility of a witness. . . . It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Citation omitted; internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 222–23, 100 A.3d 821 (2014); *State* v. *DeMarco*, 311 Conn. 510, 519–20, 88 A.3d 491 (2014). "The question of the credibility of witnesses is for the trier to determine. . . . Where testimony is conflicting the trier may choose to believe one version over the other . . . as the probative force of the evidence is for the trier to determine." (Citation omitted; internal quotation marks omitted.) *State* v. *Madera*, 210 Conn. 22, 37, 554 A.2d 263 (1989); see also *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, 230 Conn. 486, 507, 646 A.2d 1289 (1994).

"A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial

court's ruling." (Internal quotation marks omitted.) *State* v. *Ray*, 290 Conn. 602, 631, 966 A.2d 148 (2009).

The United States Supreme Court has explained: "When findings are based on determinations regarding the credibility of witnesses, Rule 52 (a) [of the Federal Rules of Civil Procedure][7] demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. . . . This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. . . . But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." (Citations omitted; footnote added; internal quotation marks omitted.) *Anderson* v. *Bessemer City*, 470 U.S. 564, 575, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985).

Consistent with the principles set forth previously in this opinion, we defer to the court's assessment of Webster's *credibility*.[8] That does not mean, however, that in similar fashion we defer to the court's ultimate *factual finding* with respect to the conduct underlying the purported waiver. Such finding must be supported by substantial evidence. With respect to the court's factual findings, we scrupulously have examined the record and conclude that they are supported by substantial evidence. Webster testified concerning the verbal advisement procedures he employed. Specifically, Webster testified that he sat down next to the defendant, he read each right listed on the *Miranda* rights advisement form to the defendant, he asked the defendant if he understood each right and he asked the defendant if he had any questions. Thereafter, he asked the defendant if he was still willing to talk to him. Webster testified that, in addition to this verbal advisement procedure, he asked the defendant if he understood each right, and to place his initial next to each right on the *Miranda* rights advisement form. Webster's testimony concerning the advisement procedures he employed, which the court found to be credible, and the *Miranda* rights advisement form, which was consistent with Webster's testimony and introduced into evidence by the state, amply support the court's factual finding that the defendant verbally was advised of and knowingly waived his

*Miranda* rights by speaking to Webster after having been advised of his rights. To the extent that the defendant argues that the court's findings, viewed as a whole and in light of all of the evidence presented, should undermine our confidence in the trial court's fact-finding process or leave us with the definite and firm conviction that the court made a factual mistake, we are not persuaded.

At the heart of the defendant's argument is what he describes as the " 'inescapably incongruent' " reliance by the court on Webster's testimony and its finding that the signature on the *Miranda* rights advisement form and the other examples of the defendant's signature "did not *appear* to be the same." (Emphasis added.) In contrast with the arguments advanced by the defendant before the trial court, the court did not draw any sinister inferences from its finding with respect to the distinctiveness of the signature on the form. Consistent with the arguments the defendant advanced before the trial court, his argument is based on the premise that any disparity with respect to the appearance of the signature and the appearance of the other signatures in evidence suggests factual error because it necessarily conflicts with the court's subordinate finding that Webster's testimony was truthful. Thus, the defendant suggests that, once the court found that the signatures appeared to be distinct, it could only have found that a valid waiver did not occur.

The court, however, expressly stated that it *did not find* that the signatures at issue were made by two different individuals and *did not find* that Webster had testified falsely. The court *did not find* that the defendant's signature had been forged, let alone that Webster had forged the signature. Certainly, it is not unusual for a court to be confronted with conflicting evidence. To the extent that any conflict existed between the court's subordinate findings of fact with respect to whether the defendant signed the waiver portion of the *Miranda* advisement form, in its evaluation of the ultimate factual issue before it, the court reasonably could have reconciled its subordinate findings by inferring that, whether intentionally or unintentionally, the same person, at different times and under different circumstances, may generate multiple signatures that appear to be dissimilar.

Moreover, whether the defendant signed the *Miranda* rights advisement form was not dispositive of the waiver issue. As we stated previously in this opinion, the state was not obligated to prove that a written waiver had been made. The court resolved the waiver issue by relying solely on the evidence that Webster verbally had advised the defendant of his rights, asked the defendant if he understood them, and asked the defendant if he wished to speak with him. There was evidence that the defendant's *course of conduct*

during the interview process indicated that he had waived his *Miranda* rights after Webster orally advised him of such rights. The court based its finding that a valid waiver occurred on the evidence that Webster verbally advised the defendant of his *Miranda* rights and, thereafter, the defendant indicated that he was still willing to speak with Webster. Thus, the court's general observation with respect to the appearance of the signatures at issue does not undermine our confidence in the correctness of its factual findings that were consistent with Webster's testimony.

## II

Next, the defendant claims that the evidence did not support his conviction of criminal possession of a firearm. We disagree.

The following additional facts are relevant to this claim. As discussed in part I of this opinion, the defendant moved to suppress the statements that he made to Webster. The defendant's motion was grounded in his claim, of a constitutional nature, that his statement was made while he was in police custody, while he was subjected to a custodial interrogation, and when he had not been advised of his *Miranda* rights. The court denied the motion.

At the close of the state's case-in-chief, the defendant moved for a judgment of acquittal as to both counts. Defense counsel argued that the state had not disproven self-defense beyond a reasonable doubt and that "the only evidence that we have of any violence or altercation . . . comes in from the defendant's own testimony." Defense counsel argued: "If you want to discount [the defendant's] statement, then there's [no] evidence that anybody actually shot [the victim]. There's no other witness that corroborates any shooting, short of the statement by [the defendant]." The court denied the motion after determining (1) that the state had presented evidence, other than the defendant's statement to the police, to demonstrate that the defendant intentionally shot the victim, and (2) that the jury reasonably could disbelieve that the defendant had acted in self-defense.

Following the jury's verdict, the defendant filed a second motion for a judgment of acquittal,[9] in which he sought a judgment of acquittal or, in the alternative, a new trial. Therein, the defendant argued that, with respect to his conviction of criminal possession of a firearm, "[t]he sole evidence that [he] possessed any firearm introduced by the state came through [his] own unsworn, unwritten statement to . . . Webster" and that "[n]o other corroborating evidence of possession was introduced, nor could be considered by the jury." In this motion, the defendant explicitly challenged the admission of his incriminatory statement. The defendant argued that, "[p]ursuant to the corpus delicti rule

and the fact that the gravamen of the conviction for violating § 53a-217 rests in the possession, not the use, of the firearm, [his] statement should not have been admitted against him without corroborating evidence . . . .” During oral argument concerning the motion, the prosecutor argued that the state had presented sufficient evidence to corroborate the statement in that it presented evidence that supported a finding that, on September 29, 2010, the defendant and the victim were engaged in a dispute, a bystander overheard the defendant threaten to shoot the victim, multiple bystanders heard gunshots, a bystander was observed picking up what appeared to be spent shells from the ground where the shooting occurred, and the victim received medical treatment for a gunshot wound in his shoulder. Moreover, the prosecutor argued that there was evidence that the defendant told Webster that he obtained the gun used in the shooting from his associate, Ruiz.

After setting forth the appropriate legal standard, the court stated: “There is corroborative evidence, which the jury could have credited, and apparently did, to support [the defendant’s statement that he possessed a firearm], and [it is] as follows: the evidence that [the victim] was shot by a gun; the evidence that the shots were fired that day in the vicinity of the defendant; the defendant was identified as being on-site at that time on that day; there’s evidence of a motive . . . that [the victim] and [the defendant] were in [a] dispute over who could be selling drugs in that area; the statement by the defendant . . . that he was going to shoot [the victim]; that the witnesses heard gunshots . . . all of that corroborates that [the defendant] shot [the victim] with a gun, and in order to shoot him he had to have held it and possessed it. So, there is in fact corroborative evidence supporting his statement.

“This isn’t a case where [the defendant] showed up at a police station and said, I shot somebody, I shot [the victim], and nobody found [the victim] with any gunshots, nobody knew of any gunshots, nobody knew of anybody firing a gun. This is totally different from that situation, which is the situation that the corpus delicti rule is designed to prevent, convicting someone based solely on a naked statement; that’s not this case. So, for the reasons stated, [the] motion for [a] judgment of acquittal is . . . denied.”

In the present claim, the defendant reiterates in substance the corpus delicti claim that he arguably raised in his motion for a judgment of acquittal at the close of the state’s case-in-chief and, more clearly raised in his postverdict motion for a judgment of acquittal. Conceding that the statement sufficiently was corroborated for purposes of the assault in the first degree conviction, his claim is directed at the use of the statement for purposes of proving the conviction of criminal possession of a firearm. The state, urging this court to conclude

that the present claim is an unpreserved claim that is not reviewable, argues that the claim does not challenge the sufficiency of the evidence, but that, at its essence, it challenges the court's admission of the defendant's inculpatory statement. The state argues that the corpus delicti rule is a rule of admissibility and, in accordance with relevant precedent, is properly raised at trial by means of an objection to the admissibility of a defendant's inculpatory statement for lack of corroborative evidence. At no point during the trial did the defendant object to the admissibility of his statement on the basis of the corpus delicti rule; he raised the corpus delicti rule in the context of challenges to the evidentiary sufficiency of the state's case. The defendant, while acknowledging that he did not raise the claim in his motion to suppress, nonetheless argues that he preserved the claim because, on other grounds, he challenged the admissibility of his statement and, thereafter, twice raised the corpus delicti issue in the context of his motions for a judgment of acquittal. The defendant argues that, in light of the fact that he raised the issue before the trial court and the trial court addressed the issue on its merits, the claim is not unpreserved and the claim does not reflect an attempt to ambush the trial court by means of raising a claim for the first time on appeal.

As the defendant acknowledges, in *State* v. *Leniart*, 166 Conn. App. 142, 151, 140 A.3d 1026, cert. granted, 323 Conn. 918, 150 A.3d 1149, and cert. granted, 323 Conn. 918, 149 A.3d 499 (2016),[10] this court recognized "that under Connecticut law the corpus delicti rule is an evidentiary rule regarding the admissibility of confessions rather than a substantive rule of criminal law to be applied in reviewing the sufficiency of the state's evidence." With respect to the reviewability of corpus delicti claims, the court stated: "A defendant who fails to challenge the admissibility of the defendant's confession at trial is not entitled to raise the corroboration rule on appeal because (1) the evidentiary claim is not of constitutional magnitude and, thus, cannot meet [the] second prong [of *State* v. *Golding*, 213 Conn. 233, 239, 567 A.2d 823 (1989); see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying *Golding*'s third prong)][11] . . . and (2) the rule does not implicate the sufficiency of the state's evidence." (Citation omitted; footnote altered.) *State* v. *Leniart*, supra, 168. With respect to the corpus delicti claim before it, which was raised for the first time on appeal in the context of a sufficiency of the evidence claim, the court in *Leniart* determined that "because the defendant did not object to the admission of the confessions, he is not entitled to raise the corroboration rule on appeal, and, thus, the confessions are substantive evidence that can be used in analyzing his sufficiency of the evidence claims." Id., 168–69.

In *Leniart*, the court's analysis of the corpus delicti

issue was guided by ample precedent that included our Supreme Court's decision in *State* v. *Uretek, Inc.*, 207 Conn. 706, 713, 543 A.2d 709 (1988), and this court's decision in *State* v. *Heredia*, 139 Conn. App. 319, 324–25, 55 A.3d 598 (2012), cert. denied, 307 Conn. 952, 58 A.3d 975 (2013). *State* v. *Leniart*, supra, 166 Conn. App. 159–62. In *Uretek, Inc.*, our Supreme Court declined to review a corpus delicti claim because the defendant "failed to object to the admission of the statements at trial or to move for a judgment of acquittal on the basis of a lack of corpus delicti evidence"; id., 160; see *State* v. *Uretek, Inc.*, supra, 713; and the claim did not warrant the type of extraordinary review afforded unpreserved constitutional claims because it did "not implicate a fundamental constitutional right . . . ." *State* v. *Uretek, Inc.*, supra, 713. In *Heredia*, this court, expressly relying on *Uretek, Inc.*, declined to review a claim, not raised in any manner before the trial court, that a "conviction must be set aside because the state failed to sufficiently corroborate [a defendant's] confessions with independent evidence and, thus, failed to comply with the rule of corpus delicti." *State* v. *Heredia*, supra, 323. This court, recognizing that corpus delicti is an evidentiary rule, adhered to the principle that "corpus delicti does not implicate a fundamental constitutional right sufficient to satisfy the standard set forth in *Golding*."[12] Id., 324.

In *State* v. *Robert H.*, 168 Conn. App. 419, 421, 146 A.3d 995, cert. granted, 323 Conn. 940, 151 A.3d 845 (2016),[13] a defendant raised a claim of evidentiary insufficiency. He argued that the evidence was insufficient to support his conviction and, relying on the corpus delicti rule, argued that an incriminatory statement that he provided to the police, which was admitted into evidence, should not be considered in an evaluation of the evidence. Id., 421–22. This court stated in relevant part: "Because this court recently held, in [*Leniart*] . . . that the corroboration rule is solely a rule of admissibility, we agree with the state that the defendant cannot raise his unpreserved [corpus delicti] claim as part of his claim of insufficient evidence. Accordingly, it is not necessary for us to decide whether there was substantial independent evidence tending to establish the trustworthiness of the defendant's confession, and we will consider his unobjected-to statements in the light most favorable to the state in evaluating his current claim of evidentiary insufficiency." Id., 422.

Although the present claim is couched as a claim of evidentiary insufficiency, which is a type of claim that is reviewable on appeal even if it is not preserved at trial; see, e.g., *State* v. *Revels*, 313 Conn. 762, 777, 99 A.3d 1130 (2014), cert. denied,      U.S.     , 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015); it is essentially based on a violation of a rule of admissibility, the corpus delicti rule. A consideration of alleged error in the admission of evidence does not have a proper role in

a consideration of the sufficiency of the evidence underlying the defendant's conviction; *State* v. *Leniart*, supra, 166 Conn. App. 169 n.20; and our consideration of the evidence properly would encompass the evidence as a whole. We recognize that the defendant did not object on the ground of insufficient corroboration at the time of the admission of his inculpatory statement yet, in light of the arguments that he raised in his motions for a judgment of acquittal, it is not accurate to state that he failed to raise the substance of the present evidentiary claim before the trial court. Indeed, when the defendant raised the issue in his motions for a judgment of acquittal,[14] the court carefully considered and rejected the claim on its merits. For these reasons, we conclude that the present claim is distinguishable from the corpus delicti claims in *Leniart* and *Robert H.* that were raised for the first time on appeal and, thus, were deemed to be unreviewable.

We will consider the defendant's claim as a challenge to the court's denial of his motions for a judgment of acquittal. We observe that, because the defendant's corpus delicti claim is evidentiary in nature, however, it would have been appropriate for the defendant to have raised the claim seasonably, at the time that the statement was offered in evidence by the state, rather than in the context of challenging the sufficiency of the evidence in the state's case. By the time that the defendant raised the present claim, the issue of the admissibility of the statement had been decided and the highly incriminatory evidence was before the jury. Thus, even if the court, following the motion for a judgment of acquittal made at the close of the state's case-in-chief, determined that it was appropriate to strike the statement from the evidence, such a course of action may not have provided significant relief to the defendant. Additionally, by raising the corpus delicti claim at the time that the evidence is offered, the state would have been afforded a fair opportunity to have presented evidence, if any, that it deemed necessary to corroborate the statement, if it had not presented such evidence prior to offering the statement in evidence.

The present version of the corpus delicti rule, which applies to the admission of inculpatory statements involving all types of crimes, requires that the state present corroborative evidence to establish the trustworthiness of the statement, but that such evidence "need not be sufficient, independent of the statements, to establish the corpus delicti." (Internal quotation marks omitted.) *State* v. *Hafford*, 252 Conn. 274, 316, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000). Having reviewed the evidence in its entirety, we are persuaded that the court properly concluded that the defendant's inculpatory statement was sufficiently corroborated and that the court properly considered it in evaluating the evidence that supported a finding of the defendant's guilt of criminal

possession of a firearm. As the court correctly observed, the state proved that the defendant's statement was trustworthy by means of evidence that demonstrated that the defendant was at the scene of the crime, that he was involved in an altercation with the victim, that he threatened to shoot the victim, that a shooting occurred, and that the victim sustained a gunshot injury. In denying the defendant's motions for a judgment of acquittal, the court adequately discussed the evidence that corroborated the statement and, ultimately, demonstrated that the state met its burden of proof. Accordingly, we reject the defendant's claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The court sentenced the defendant to a total effective term of incarceration of twelve years, followed by twelve years of special parole.

[2] The state presented evidence that, on September 29, 2010, following the defendant's argument with and subsequent shooting of the victim, New Britain police officers met with the victim, who was obtaining medical treatment for a gunshot wound at Hartford Hospital. At that time, a police officer photographed the victim. Two photographs taken of the victim, while he was in the hospital, were admitted into evidence. One of the police officers testified that the victim was not cooperative in terms of being photographed or in terms of providing the police officers with any information relative to their investigation. The victim did not testify at trial.

[3] Two bystanders recognized the defendant and identified him by his street name, Lagrima. One bystander videotaped a small portion of the incident, thereby capturing images of the victim, holding an object that appeared to be a long stick, during the argument.

[4] See *Miranda* v. *Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[5] The bottom portion of the *Miranda* rights advisement form, entitled "WAIVER OF RIGHTS," states: "I have been advised of my rights, I fully understand these rights, I am willing to be interviewed and answer questions. I do not wish the presence of an attorney at this time. I am waiving my rights freely and voluntarily, without any fear, threat or promises made to me." The defendant's signature appears on the form after this language.

[6] Webster's signature appears in the waiver portion of the *Miranda* rights advisement form, in the space provided for "Officer Administering Warnings."

[7] Rule 52 (a) (6) of the Federal Rules of Civil Procedure provides: "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."

[8] We note that, in a letter of supplemental authority submitted to this court by the defendant, he argues that this court's recent decision in *State* v. *Brito*, 170 Conn. App. 269, 154 A.3d 535, cert. denied, 324 Conn. 925, 155 A.3d 755 (2017), stands for the proposition that this court may evaluate whether a trial court's decision to credit the testimony of a witness is clearly erroneous. In setting forth the claim raised by the appellant in *Brito*, this court, quoting from the appellant's brief, stated that the appellant's claim was whether "[t]he court's decision to credit [a witness'] testimony . . . was clearly erroneous . . . ." (Internal quotation marks omitted.) Id., 288. After scrupulously examining the record, we reviewed the factual finding that was based on the witness' testimony and "[w]e conclude[d] that the court's *factual determination* with respect to [the witness'] observations was supported by substantial evidence." (Emphasis added.) Id., 289. In its analysis of the claim, this court rejected the appellant's argument that other evidence contradicted the witness' version of events, on which the trial court relied, and, thus, it concluded that such evidence did not undermine the trial court's reliance on the witness' testimony in making the finding at issue. Id., 290–91. Accordingly, in *Brito*, this court afforded proper deference to the trial court's assessment of the witness' credibility while focusing its analysis on whether extrinsic evidence undermined the trial court's decision to rely on such testimony in determining the facts at issue in that case. Accord *Anderson* v. *Bessemer City*, supra, 470 U.S. 575.

[9] Following the jury's verdict, the defendant filed a separate motion for a judgment of acquittal in which he reasserted his argument that the state failed to disprove beyond a reasonable doubt his claim that he acted in self-defense. The court denied that motion, and the resolution of that separate motion is not a subject of this appeal.

[10] In *Leniart*, in response to the defendant's petition for certification to appeal, our Supreme Court granted certification to appeal limited to the following issue: "Did the Appellate Court properly apply the corpus delicti rule in concluding that there was sufficient evidence to sustain the defendant's convictions for murder and capital felony?" (Internal quotation marks omitted.) *State* v. *Leniart*, 323 Conn. 918, 918–19, 149 A.3d 499 (2016). Additionally, in response to the state's petition for certification to appeal, our Supreme Court granted certification to appeal with respect to four issues, all of which are unrelated to this court's resolution of the corpus delicti claim. *State* v. *Leniart*, 323 Conn. 918, 150 A.3d 1149 (2016).

[11] "Under [*Golding*], a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial." (Emphasis added; internal quotation marks omitted.) *State* v. *Fabricatore*, 281 Conn. 469, 476–77, 915 A.2d 872 (2007); see *In re Yasiel R.*, supra, 317 Conn. 781.

[12] With respect to the authority on which we rely in analyzing the present claim, the defendant asserts that, because our Supreme Court has granted certification to appeal in *Leniart*, we should not rely on that decision because it "is not binding precedent while it is pending before the Supreme Court." Although the defendant relies, in part, on Practice Book § 84-3, that rule of practice does not support his novel argument because it pertains to proceedings to enforce or carry out the judgment of this court while the judgment is under further review; it does not address the precedential value of this court's decision while the judgment that emanated from it is under further review. Practice Book § 84-3 provides that, following a grant of certification by our Supreme Court, "*proceedings to enforce or carry out the judgment*" of this court "shall be stayed . . . until the final determination of the cause . . . ." (Emphasis added.) Practice Book § 84-3.

Additionally, the defendant relies on *State* v. *Jordan*, 151 Conn. App. 1, 35 n.9, 92 A.3d 1032, cert. denied, 314 Conn. 909, 100 A.3d 402 (2014), and *State* v. *Oral H.*, 125 Conn. App. 276, 280, 7 A.3d 444 (2010), cert. denied, 300 Conn. 902, 12 A.3d 573, cert. denied, 564 U.S. 1009, 131 S. Ct. 3003, 180 L. Ed. 2d 831 (2011). In *Jordan*, this court characterized another decision of this court, in which certification to appeal had been granted by our Supreme Court, as "lend[ing] little precedential support to the defendant's argument." *State* v. *Jordan*, supra, 35 n.9. In *Oral H.*, the defendant argued that, after this court held that a statute was unconstitutional and our Supreme Court granted certification to appeal from that decision, the state was precluded from charging him under the invalidated statute unless and until such time as our Supreme Court upheld the constitutionality of the statute. *State* v. *Oral H.*, supra, 280. In rejecting the defendant's argument, this court stated that the premise of the defendant's argument was flawed legally because "a stay on the judgment of this court remained in effect until our Supreme Court rendered its final determination of the cause . . . ." Id. In *Jordan*, the court addressed the issue of precedential authority very briefly, and it did not conclude, as the defendant suggests, that the precedent at issue lacked any authority. Likewise, in *Oral H.*, this court did not conclude that the precedent at issue lacked any authority. Instead, invoking Practice Book § 84-3, the court in *Oral H.* appears to have resolved the narrow issue before it, concerning the enforceability of this court's earlier decision to invalidate a statute, by determining that, following the grant of certification to appeal, the decision to invalidate the statute, like the judgment that flowed from the decision, should not be given legal effect. Having reviewed these authorities on which the defendant relies, we are not persuaded that they are dispositive of his argument.

"It is well settled that a denial of certification by an appellate court does not signify approval of the decision from which certification to appeal is sought." *A. Auidi & Sons, LLC* v. *Planning & Zoning Commission*, 72 Conn. App. 502, 512, 806 A.2d 77 (2002), aff'd, 267 Conn. 192, 837 A.2d 748 (2004). Similarly, there is no reason to conclude that a granting of certification by our Supreme Court necessarily signifies disapproval of the decision from which certification to appeal was granted. There is no authority to support the proposition that a grant of certification by our Supreme Court

immediately invalidates or overrules this court's decision; a grant of certification stays further proceedings and subjects this court's decision to further review. In such circumstances, prior to a final determination of the cause by our Supreme Court, a decision of this court is binding precedent on this court. The defendant has not brought any persuasive authority to our attention to demonstrate otherwise.

[13] In *Robert H.*, our Supreme Court granted certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the corpus delicti rule is merely a rule of admissibility, in determining that there was sufficient evidence to sustain the defendant's second conviction of risk of injury to a child in violation of General Statutes § 53-21 (a) (1)?" (Internal quotation marks omitted.) *State* v. *Robert H.*, 323 Conn. 940, 151 A.3d 845 (2016).

[14] As noted previously, the defendant's postverdict motion entitled "Motion for Judgment of Acquittal" sought, in the alternative, a new trial.